Bob HALLORAN, Plaintiff,

v.

**OHLMEYER COMMUNICATIONS COMPANY and Don Ohlmeyer, Defendants.**

No. 84 Civ. 5003(WCC).

United States District Court, S.D. New York.

Sept. 27, 1985.

Hess, Segall, Guterman, Pelz, Steiner & Barovick, New York City, for plaintiff; Charles H. Miller, New York City, of counsel.

Pryor, Cashman, Sherman & Flynn, New York City, for defendants; Stephen F. Huff, Andrew H. Bart, David A. Nicholas, New York City, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Bob Halloran ("Halloran") commenced this action against defendants Donald W. Ohlmeyer, Jr. ("Ohlmeyer") and Ohlmeyer Communications Company ("OCC") seeking damages for breach of an alleged oral joint venture agreement to produce a televised golf program. The Court has subject matter jurisdiction of this action based upon the diversity of citizenship of the parties. 28 U.S.C. § 1332 (1982). Defendants Ohlmeyer and OCC have moved for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."). For the reasons stated below, defendants' motion is denied.

*Background*

Plaintiff Halloran is vice president of sports and special events for Caesar's World, Inc., and has been involved in sports

broadcasting for more than two decades. Affidavit of Bob Halloran in Opposition to Defendants' Motion for Summary Judgment ¶ 3 [hereinafter cited as "Halloran Aff."]. Defendant Ohlmeyer is president of defendant OCC, and has been involved in the production and direction of televised sporting events for many years. Affidavit of Donald W. Ohlmeyer, Jr. in Support of Defendants' Motion for Summary Judgment ¶¶ 1, 2 [hereinafter cited as "Ohlmeyer Aff."]. Almost all of the remaining facts are in dispute.

*Plaintiff's Version of the Facts*

Halloran's version of the relevant facts is as follows: He avers that in June 1982 he approached Ohlmeyer to discuss the possibility of producing a television program based on the golf game "skins."[1] Deposition of Bob Halloran at 21 [hereinafter cited as "Halloran Dep."]. He alleges that during the course of the discussion, he and Ohlmeyer entered into an oral joint venture agreement to produce a "Skins" program and sell it to a television network. Halloran Aff. ¶¶ 8–11.

According to Halloran, the parties agreed that "each ... would have total involvement in and equal control over the project, with the understanding that each would defer to the other's special expertise." *Id.* ¶ 11. Halloran was to approach potential participants and to develop the show format. *Id.* ¶ 10. Ohlmeyer was to concentrate on interesting a network in purchasing the program. *Id.* They were to share equally in the profits from the show. *Id.* ¶ 11.

Halloran says that after his meeting with Ohlmeyer, he renewed his earlier contacts with Jack Nicklaus and Tom Watson, two well-known professional golfers, to attempt to secure their participation in a Skins program. *Id.* ¶ 12. In January 1983, Halloran met with Nicklaus in Palm Springs, California, and Halloran alleges that Nicklaus agreed, subject to certain conditions, to participate in the Skins telecast. *Id.* ¶ 13.

Halloran states that he informed Nicklaus of Ohlmeyer's involvement for the first time at this meeting. *Id.*

Later in January 1983, Halloran met with Ohlmeyer "to discuss [their] strategy in light of Nicklaus' acceptance." *Id.* ¶ 14. Halloran avers that Ohlmeyer indicated that Nicklaus's commitment would facilitate the sale of Skins to a network, and that Ohlmeyer agreed to approach NBC. *Id.*

Halloran claims that he tried unsuccessfully to reach Ohlmeyer for several months. The two next met sometime in May 1983. Halloran contends that it was at this meeting that Ohlmeyer first told him that there were difficulties licensing Skins to a network. *Id.* ¶ 16. Ohlmeyer informed him that because none of the networks was interested in Skins, Ohlmeyer had brought Barry Frank ("Frank") of Trans World Industries ("TWI") into the Skins project as a third partner. *Id.* Ohlmeyer proposed that they purchase the necessary air time from NBC and produce the Skins program independently. *Id.*

Halloran states that Ohlmeyer gave him two alternatives: Halloran could either underwrite one-third of the potential two-million-dollar loss from the independent production of Skins or sell his interest in Skins and remain a salaried consultant. *Id.* ¶ 17. Halloran stated that neither of these alternatives was satisfactory, and when Ohlmeyer refused to reconsider, he instituted this action. *Id.* ¶ 18.

*Defendants' Version of the Facts*

Ohlmeyer's version of the parties' relationship is somewhat different, to say the least. He claims that he first met with Halloran in November 1982. Deposition of Donald W. Ohlmeyer, Jr. at 25 [hereinafter cited as "Ohlmeyer Dep."]. According to Ohlmeyer, all of their discussions concerning the possibility of televising Skins were preliminary. Ohlmeyer Aff. ¶ 6. He maintains that "[t]here was no discussion of

---

**1.** "Skins" is a competition among three or more golfers in which the outright winner of a given hole is awarded a specified sum of money. If there is no outright winner, the stakes for the hole are carried over and added to those for the next hole.

promotion, production, sharing of revenues or expenses, advertising, or many of the other issues critical to the production of a sports telecast." *Id.* ¶ 7. He avers that at no time did they reach an agreement or form a partnership. *Id.* He says that they did agree that Ohlmeyer would approach the networks to "ascertain the viability of a license deal for 'Skins,'" and that both Halloran and Ohlmeyer would contact potential participants. *Id.*

Ohlmeyer contends that after his meeting with Halloran, he contacted ABC and NBC, but neither network was interested in buying Skins. *Id.* ¶ 8. Ohlmeyer maintains that he informed Halloran by phone that the networks were not interested in licensing Skins and told him that the only way to proceed with the project was to buy the air time, sell the advertising, and underwrite the total cost of the production. *Id.* ¶ 9. Ohlmeyer alleges that Halloran refused "in clear and unambiguous terms" "to take any financial risks." *Id.* ¶ 10.

Ohlmeyer then approached Barry Frank, president of TWI, about participating in the Skins production. *Id.* Ohlmeyer informed Frank that, based on Ohlmeyer's prior discussions with Halloran, Halloran would be offered an opportunity to participate. *Id.* Frank expressed interest in the project. *Id.*

Ohlmeyer says that he then informed Halloran of TWI's participation and again offered Halloran the opportunity to participate. *Id.* ¶ 11. According to Ohlmeyer, Halloran again refused to underwrite any of the potential two-million-dollar loss on Skins. *Id.* Accordingly, Ohlmeyer offered Halloran the option of acting as a salaried consultant on Skins. *Id.* Ohlmeyer alleges that he and Halloran referred the matter to their respective attorneys, but that negotiations broke down when Halloran insisted on a percentage of the profits from Skins despite his unwillingness to accept an equal percentage of the risk. *Id.*

Ohlmeyer, OCC, Frank, and TWI bought the air time for Skins from NBC, lined up participants and sponsors, and produced a Skins program which aired in November 1983, *id.* ¶ 12, and again in 1984, Defendants' Statement Pursuant to Rule 3(g) of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ¶ 18 [hereinafter cited as "Defendants' 3(g) Statement"]. Skins was then picked up on a twenty-year option by the Professional Golfers Association tour. Defendants' 3(g) Statement ¶ 18.

Halloran commenced this action in July 1984. As noted above, defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56(b).

*Applicable Standards*

The standards governing the decision of a motion for summary judgment are well settled. "'[O]n a motion for summary judgment, the court cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)). "'[T]he key is issue-finding, not issue-resolution.'" *Id.* (quoting *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor,"* 691 F.2d 603, 606 (2d Cir.1982)). Thus, summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980).

The moving party bears the burden of proving that no material factual issues are genuinely in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Quinn*, 613 F.2d at 444–45. When the moving party comes forward with supporting evidence, the opposing party may not rest upon mere conclusory allegations or denials, but must set forth, by affidavits or material obtained through discovery, specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Quinn*,

613 F.2d at 445. The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975).

*Discussion*

Defendants advance several grounds in support of their motion for summary judgment. First, defendants argue that, as a matter of law, the terms of the agreement alleged by plaintiff are insufficient to give rise to a joint venture. Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 12–18 [hereinafter cited as "Defendants' Memorandum"]. Second, defendants argue that, even assuming the parties entered into the agreement alleged by plaintiff, such an agreement is rendered unenforceable by the New York statute of frauds. *Id.* at 8–12. Third, defendants maintain that any joint venture that was formed was for the limited purpose of selling a single Skins program to a television network and terminated when the attempt to sell Skins to a network failed. *Id.* at 18–20. Finally, defendants assert that plaintiff contributed nothing to the production of Skins and is therefore not entitled to recovery on a quantum meruit theory. *Id.* at 20–23.

*Existence of a Joint Venture*

Under New York law, a joint venture "has been variously defined as an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; [and] a combination of property, efforts, skill and judgment in a common undertaking." *United States v. Standard Oil Co.,* 155 F.Supp. 121, 148 (S.D.N.Y.1957), *aff'd,* 270 F.2d 50 (2d Cir. 1959). "The ultimate inquiry is whether the parties have so joined their property interest, skills and risks that for the purpose of the particular adventure their respective contributions have become one and the commingled properties and interest of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." *Hanlon v. Melfi,* 102 Misc.2d 170, 174, 423 N.Y.S.2d 132, 135 (Sup.Ct. Suffolk County 1979).

▉ The crucial factors to be considered in determining whether a joint venture exists are "the intent of the parties, express or implied, whether there was joint control and management of the business, whether there was sharing of profits and losses, and whether there was a combination of property, skill or knowledge." *Sherrier v. Richard,* 564 F.Supp. 448, 457 (S.D.N.Y. 1983) (citing *Ramirez v. Goldberg,* 82 A.D.2d 850, 852, 439 N.Y.S.2d 959, 961 (2d Dep't 1981) (per curiam)). A joint venture may be created by oral agreement or implied from conduct. *McGhan v. Ebersol,* 608 F.Supp. 277, 282 (S.D.N.Y.1985); *Chalmers v. Eaton Corp.,* 71 A.D.2d 721, 722, 419 N.Y.S.2d 217, 219 (3d Dep't 1979) (per curiam).

▉ Defendants argue that Halloran has not met his burden of demonstrating the existence of a partnership or joint venture. Defendants' Memorandum at 13. Specifically, they claim that Halloran has not established that he agreed to a sharing of profits and losses or to joint control and management of the venture.[2] *Id.* at 13–16. However, in the context of defendants' motion for summary judgment, Halloran need only present sufficient evidence from which to conclude that there is a genuine issue of material fact as to the existence of the alleged agreement. From the supporting

---

**2.** Citing *Mariani v. Summers,* 3 Misc.2d 534, 537–38, 52 N.Y.S.2d 750, 754 (Sup.Ct.N.Y.County 1944), *aff'd mem.,* 269 A.D. 840, 56 N.Y.S.2d 537 (1st Dep't 1945), plaintiff contends that an agreement to share losses is not indispensably essential to the existence of a joint venture, Plaintiff's Memorandum at 12. However, it is clear that *Mariani* holds merely that there need not be an *express* agreement to share losses:

"[I]n the absence of an express agreement every party to a joint venture is bound by his relation to his associates to share with them the losses sustained which, in the absence of an agreement fixing a different ratio will be presumed to have been intended to be in the same proportion as they share the profits." *Mariani,* 3 Misc.2d at 538, 52 N.Y.S.2d at 754.

papers, it is apparent that Halloran has met this burden.

At his deposition, Halloran testified that he "never anticipated any losses" from Skins, and that he "would not proceed with the program if [he] thought there were going to be losses." Halloran Dep. at 59. Relying on *McGhan*, 608 F.Supp. at 283–84 (plaintiff's "belief that the show would not involve a loss does not represent proof of any agreement to share profits or losses"), defendants argue that Halloran's statements establish that he never agreed to share the losses from Skins. Were these Halloran's only statements concerning potential losses, I might be inclined to agree. However, when pressed by defendants' counsel, Mr. Huff, Halloran stated,

> I guess you could say that *if there were going to be losses*, that is I was a partner, according to a partnership, *I would have to share in the losses*, but, again, on television shows such as this and the way this is structured, you know going in where your position is.

Halloran Dep. at 59–60 (emphasis added). Halloran's deposition testimony, considered as a whole, and viewed, as it must be, in the light most favorable to him, *see Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608, is sufficient to raise a genuine issue of material fact as to the existence of an implicit agreement to share in whatever losses arose.[3]

Similarly, Halloran has met his burden with respect to the existence of an agreement to share profits. He stated several times during his deposition and in his affidavit that he and Ohlmeyer agreed to share the profits from Skins equally. *See, e.g.,* Halloran Dep. at 59 ("Ohlmeyer and I were 50/50 partners in everything. We had a partnership deal. Q. Losses as well as profits? A. We were a 50/50 partner.");

*id.* at 109 ("A. I—it was my idea and he was aboard with me. Q. Okay. A. With me as a partner, 50/50."); *id.* at 164 ("[W]e were partners, as I believed I testified to, we agreed to be partners. That was my understanding after our first meeting. And I brought this idea to him and we would be partners, 50/50 partners."); Halloran Aff. ¶ 11 ("[W]e would share equally in the profits derived from the show.").

■ Defendants also claim that the parties never agreed to joint control and management of the venture. They assert that Halloran was completely passive and relied entirely on Ohlmeyer. Defendants' Memorandum at 15–16. In support of their argument, defendants rely mainly on the fact that Ohlmeyer alone was responsible for ascertaining the networks' interest in licensing Skins. However, the requirement of joint control and management cannot mean that each coventurer must involve himself in every detail of the venture. Surely the parties to a joint venture may choose to divide the responsibilities between themselves and defer, as Halloran claims he and Ohlmeyer did, to each other's different areas of expertise. The supporting papers provide ample evidence from which to conclude that Halloran was not completely passive. They indicate not only that he actively pursued potential participants, *see infra* p. 1221, but also that he attempted to interest several sponsors in the Skins program, *see* Halloran Dep. at 173–74. This evidence is sufficient to raise an issue of fact as to whether the parties agreed to joint control of Skins.

*Statute of Frauds*

Having concluded that an issue of fact exists as to whether there was an agreement between the parties, I next address

---

**3.** Additionally, plaintiff argues that the parties' implicit understanding "that, should the project fail, [they] would bear individually the risk of losing the value of their time and services as well as the value of incidental expenses incurred by them during their development of the project" was sufficient to constitute the necessary agreement to share losses. Plaintiff's Memorandum at 13. While this argument is not

without support, *see Ramirez,* 82 A.D.2d at 852, 439 N.Y.S.2d at 961 ("An individual who offers services for a share of the net profits from several transactions, risks losing the value of those services, and therefore is subject to losses."), in light of my conclusion above that there is a genuine issue of material fact as to the existence of an implicit agreement to share losses, I need not reach it.

defendants' argument that even if there were such an agreement between the parties, it would be unenforceable under the New York statute of frauds, N.Y.Gen. Oblig.Law § 5–701(a)(1) (McKinney 1978),[4] since it was not capable of performance within a year. Defendants' Memorandum at 8–12. The parties differ on whether the New York statute of frauds applies to joint venture agreements, and each side has cited cases in support of its position. Although neither party cited the case to the Court, *Ebker v. Tan Jay Int'l, Ltd.*, 739 F.2d 812 (2d Cir.1984), is controlling on this issue. As Judge Friendly observed,

> Despite some sweeping pronouncements to the effect that the New York statute of frauds, N.Y.Gen.Oblig.Law § 5–701(a)(1), does not apply to joint ventures, these must mean only that a writing is not required simply because the transaction is a joint venture, and the statute must apply to joint ventures having a stated term of more than one year, as the plain language of § 5–701(a) of the New York General Obligations Law dictates.

*Id.* at 827. Similarly, in *Chromalloy Am. Corp. v. Universal Hous. Sys. of Am., Inc.*, 495 F.Supp. 544, 550–51 & n. 8 (S.D.N. Y.1980), *aff'd mem.*, 697 F.2d 289 (2d Cir. 1982), Judge Broderick explained that those cases suggesting that joint ventures are outside the scope of the statute of frauds are cases in which the *subject matter* of the joint venture agreement, and not the joint venture agreement itself, was within the statute.

Nonetheless, plaintiff argues that the oral agreement with Ohlmeyer was capable of performance within a year and is therefore outside the scope of the statute. Plaintiff's Memorandum at 5–11. In support of this argument, Halloran states in his affidavit in opposition to the instant

motion that the agreement contemplated "*one* show, a show which ... could easily have [been] produced within one year of [the] agreement," and did not include spinoffs, future sales, or "profits beyond one year of the making of [the] agreement." Halloran Aff. ¶ 21 (emphasis in original).

However, Halloran's factual claims in his affidavit directly contradict his earlier deposition testimony. Halloran repeatedly testified at his deposition that Skins was *not* to be a "one-shot deal." Halloran Dep. at 45, 50, 86. Rather, the agreement contemplated a "long-range plan" for an "annual" and "ongoing" program. *Id.* at 14, 15, 17, 44, 47, 50–51. Exploitation of Skins was to continue for "eternity," *id.* at 16, and would include rebroadcasts of the initial program, *id.* at 106, as well as "spinoffs" "done under various formats, with different people and different places in the world," *id.* at 17; *see also, e.g., id.* at 14, 15, 35, 44, 45–46, 48, 50, 60, 105. Halloran and Ohlmeyer were to be partners "forever" on the Skins venture. *Id.* at 164–65.

■ The Court of Appeals for the Second Circuit has held that such a discrepancy between deposition testimony and an affidavit made after a motion for summary judgment will not preclude summary judgment:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969); *see also Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982); *Schwimmer v. Sony Corp. of Am.*, 637

---

**4.** Section 5–701(a)(1) provides that

[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

**1.** By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

F.2d 41, 45 (2d Cir.1980); *McGhan,* 608 F.Supp. at 286. Plaintiff has made no attempt to explain the discrepancy between his affidavit and his deposition testimony nor has he presented supporting facts indicating that his prior testimony should be discredited. In light of the clear case law in this circuit, the factual claims in his affidavit must be disregarded, and, for purposes of the instant motion, the oral joint venture agreement must be assumed to have been for a term in excess of a year.

■ However, this does not, as defendants argue, necessarily dispose of the case. As Judge Friendly explained in *Ebker,* "the only effect of the statute [of frauds] where the [joint venture] agreement has been wholly or partially executed, is to convert it into a partnership at will, wherein a partner may bring an action in equity to call his copartner to account." 739 F.2d at 828. Here, there is an issue of fact as to whether Halloran wholly or partially executed the alleged oral joint venture agreement. If he did, he may be entitled, as Judge Friendly suggested, to an accounting or possibly to other equitable relief, even though the statute of frauds would bar an action at law. But all of these issues involve questions of fact, and therefore their resolution must await a trial on the merits.

*Duration of the Joint Venture*

■ Defendants next argue that any joint venture agreement between the parties was for the limited purpose of licensing a single Skins program to a television network and terminated when Ohlmeyer's attempt to license Skins failed. Defendants' Memorandum at 18–20. However, it is clear from my discussion of defendants' statute of frauds argument above that the alleged agreement must be assumed to have been for a term in excess of a year, and to have contemplated much more than the production and sale of a single Skins program. *See supra* pp. 1220–21. Indeed, defendants take this very position throughout their papers. *See, e.g.,* Defendants' Memorandum at 4–5, 8–12. Consequently, I must reject defendants' argu-

ment that the joint venture was limited to the sale of a single Skins program.

*Quantum Meruit*

■ Defendants have also moved for summary judgment on plaintiff's quantum meruit claim. They maintain that plaintiff contributed nothing to the production of Skins. Defendants' Memorandum at 20–23. However, both in his affidavit and at his deposition, Halloran detailed his contacts with professional golfers Jack Nicklaus and Tom Watson concerning Skins, *see, e.g.,* Halloran Aff. ¶¶ 4, 6, 10, 12–13, 14, 24–25; Halloran Dep. at 33–37, 40–46, 79–82, 85–97, and Nicklaus confirmed discussing Skins with Halloran, Deposition of Jack W. Nicklaus at 5–6, 13–14. While defendants may well have been responsible for negotiating the participants' contracts to appear on Skins, plaintiff is entitled to attempt to prove that his efforts facilitated defendants' signing Nicklaus and Watson. Consequently, defendants' motion for summary judgment on plaintiff's quantum meruit claim must be denied.

*Conclusion*

For the foregoing reasons, I conclude that there exist genuine issues of material fact. Accordingly, defendants' motion for summary judgment is denied. The parties are directed to appear for a pre-trial conference on Friday, October 11, 1985 at 10:30 A.M. in Courtroom 618.

SO ORDERED.