**US AIRWAYS GROUP, INC. and U.S. Airways, Inc., Plaintiffs,**

v.

**BRITISH AIRWAYS PLC, Britair Acquisition Corp. Inc., AMR Corporation and American Airlines, Inc., Defendants.**

No. 96 Civ. 5724(MGC).

United States District Court,
S.D. New York.

Dec. 29, 1997.

Skadden, Arps, Slate, Meagher & Flom, New York City by Shepard Goldfein, Jay B. Kasner, James A. Keyte, Covington & Burling, Washington, DC by Charles F. Rule, for Plaintiffs.

Sullivan & Cromwell, New York City by John L. Warden, John W. Dickey, Daryl A. Libow, Timothy E. Sheil, Keith S. Rabois, Ronan P. Doherty, for Defendants British Airways PLC and Britair Acquisition Corp., Inc.

Weil Gotshal & Manges L.L.P., New York City by Helene D. Jaffe, Richard A. Rothman, Marc Brotman, for Defendants AMR Corp. and American Airlines, Inc.

## OPINION

CEDARBAUM, District Judge.

This is an action brought by USAirways Group, Inc. and USAirways, Inc. (collectively "USAir") against British Airways Plc and Britair Acquisition Corp. Inc. (collectively "BA"), and AMR Corporation and American Airlines, Inc. (collectively "AA"). The dispute arises out of an alliance between USAir and BA that began in 1992 and BA's subsequent decision in 1995 to pursue an alliance with AA instead. USAir sues BA for breach of contract, breach of fiduciary duty, and under a respondeat superior theory for acts of the BA directors who are also directors of USAir. USAir also asserts antitrust claims against both BA and AA under Sections 1 and 2 of the Sherman Act and against BA alone under Section 7 of the Clayton Act.

BA and AA move to dismiss the amended complaint (hereafter simply "the complaint") pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). For the reasons discussed below, AA's motion to dismiss is granted, and BA's motion to dismiss is granted in part and denied in part.

### Allegations of the Complaint

I. The Nature of the U.S.-U.K. Airline Industry

Passenger airline service between the United States and the United Kingdom is governed by a bilateral air services agreement known as Bermuda II. Pursuant to Bermuda II, non-stop service to London is permitted from twenty-six gateway cities in the United States. (Am.Compl.¶ 13.) Under Bermuda II, only two U.S. airlines provide such service to Heathrow Airport in London, AA and United Airlines. (*Id.* ¶ 15.) Demand for slots by air carriers wishing to expand or enter service to Heathrow far exceeds supply. (*Id.* ¶ 19(b).) Bermuda II does not, however, restrict U.S. carriers from applying for route authority to service London's Gatwick Airport. (*Id.* ¶ 16.) The regulatory restrictions of Bermuda II would be removed if the United States and the United Kingdom entered a liberalized air services agreement ("open skies agreement"). The United States already has open skies agreements with several other foreign counties. (*Id.* ¶ 17.)

II. The Investment Agreement and the USAir–BA Relationship

On January 21, 1993, USAir entered into an investment agreement with BA (the "Investment Agreement") which contemplated a series of three investments by BA in USAir totaling $750 million as part of a general plan to integrate and coordinate their operations. (*Id.* ¶ 23.) Section 2.6(c) of the Investment Agreement requires USAir and BA to use their "best efforts" to obtain Department of Transportation ("DoT") approval of all transactions as promptly as practicable. (*Id.* ¶ 31.) BA allegedly understood that the key to obtaining DoT approval of Phases Two and Three would be obtaining the British government's consent to liberalization of Bermuda II. (*Id.* ¶ 33.) Section 6.1(vii) of the Investment Agreement prohibited BA from entering "into any discussion, negotiations, arrangements or understandings with any third party with respect to ... an extraordinary corporate transaction involving [USAir]." (*Id.* ¶ 35.) Section 10.1(a) of the Investment Agreement requires USAir and BA to use "reasonable efforts" to consummate all contemplated transactions as soon as practicable. (*Id.* ¶ 32.)

Pursuant to Phase One, BA paid $300 million for a 20 percent voting interest in USAir, and USAir increased its Board of Directors to sixteen by adding three BA appointed board members. (*Id.* ¶¶ 27, 38(a).) On March 15, 1993, DoT issued an order stating that BA's initial investment of $300 million did not impair USAir's citizenship under applicable law and approved the proposed code sharing agreement and the wet leases. (*Id.* ¶ 36.) In connection with the Investment Agreement, USAir relinquished its three U.S.-U.K. routes from Charlotte, Baltimore, and Pittsburgh to Gatwick Airport in London. (*Id.* ¶ 25.) That relinquishment is embodied in a consent decree filed with the United States District Court for the District of Columbia dated September 30, 1993. (*Id.* ¶ 37.) USAir alleges that it entered into the consent decree while the Department of Justice was considering whether the relinquishment was necessary, because USAir had already acquiesced in BA's insistence that it relinquish those routes. (*Id.*) All three of USAir's relinquished routes to Gatwick were subsequently awarded to AA. (*Id.* ¶ 38(d).) In a separate wet lease agreement, for a share of the profits, USAir leased its aircrafts and crew used on these U.S.-U.K. routes to BA to service BA's flights to the U.S. (*Id.* ¶ 26.)

In connection with Phase One, USAir and BA entered into a code sharing agreement on January 21, 1993, pursuant to which BA placed its code on many USAir flights. However, the code sharing agreement did not permit USAir to place its code on BA flights. (*Id.* ¶ 38(b).) A coordination team named the Alliance Leadership Group was formed to finalize and implement projects furthering the alliance. (*Id.* ¶ 39.) In furtherance of the alliance, BA and USAir entered into several collaborative projects including, among other things, a linked frequent flyer program, joint sales and marketing in the United States, consolidated sales and marketing in Canada, joint ground handling arrangements in New York and Frankfurt, integrated fuel purchasing in the United States, and joint marketing of maintenance services. (*Id.* ¶¶ 38(c), 39.)

Phase Two of the Investment Agreement gave BA an option to invest an additional $200 million in USAir. (*Id.* ¶ 28.) Phase Two involved a comprehensive plan of further integration and cooperation between USAir and BA. Phase Three of the Investment Agreement, which expires on January 21, 1998, gives BA an option to invest an additional $250 million in USAir in exchange for preferred stock. (*Id.* ¶ 29.) The Investment Agreement also provides that in the event that DoT approval for Phases Two and Three occurs before January 21, 1998, USAir and BA may elect to cause BA to complete Phases Two and Three. (*Id.* ¶ 30.)

Efforts by USAir during 1994 and 1995 to further strengthen the alliance were unsuccessful. USAir alleges that BA did not take any steps to seek liberalization of Bermuda II during the three-year USAir–BA alliance, although both parties understood that such an agreement was a prerequisite for Phases Two and Three. (*Id.* ¶ 44.) Moreover, USAir's requests to make the code sharing arrangement reciprocal were rejected by BA, and BA also refused to support USAir's efforts to apply independently for routes between the United States and London. (*Id.* ¶ 50.) BA had allegedly realized by mid–1994 that further cooperation with USAir was not profitable for BA. According to the complaint, BA realized that Phase One had already provided most of the benefits that BA could enjoy from the BA–USAir alliance. (*Id.* ¶¶ 42–46.)

For that reason, according to the complaint, BA did not exercise its best efforts to obtain DoT approval even though there was a window of opportunity to do so during the summer of 1994. (*Id.* ¶ 45.) USAir alleges that BA actually discouraged British regulators from making concessions to the United States. (*Id.* ¶ 48.) BA, however, did not disclose its intention not to pursue the BA–USAir alliance and continued to mislead USAir. (*Id.* ¶ 49.)

III. The BA–AA Relationship

In November of 1994, BA began negotiating a possible alliance with AA. A general outline for such an alliance was developed by January 1, 1995. (*Id.* ¶ 55.) BA did not

inform USAir of the negotiations between BA and AA, which continued through 1995. (*Id.* ¶¶ 57, 58.) BA and AA allegedly were conspiring to stifle USAir's efforts to compete in the U.S.-U.K. market. (*Id.* ¶ 60.) On September 21, 1995, BA finally informed USAir that it had been negotiating a strategic alliance with AA. The directors of BA who sat on USAir's Board of Directors, however, did not inform USAir of the true scope of the alliance. They allegedly assured USAir's Board that BA would not enter into any agreement that was not acceptable to USAir. (*Id.* ¶ 63.)

In the fall of 1995, USAir and United Airlines began discussions concerning United Airlines' possible acquisition of USAir. (*Id.* ¶ 64.) In September of 1995, BA and AA allegedly agreed to undermine United Airline's acquisition of USAir. (*Id.* ¶ 65.) The strategy of BA and AA was to have AA engage in sham negotiations for acquisition of USAir. (*Id.* ¶ 67.) AA allegedly forced United Airlines to back away from any plans to acquire USAir by informing United Airlines that it would respond to any bid by United Airlines or would protect AA's competitive position "by other means as necessary." (*Id.* ¶ 71.) On November 13, 1995, United Airlines announced that it would not seek to acquire USAir. (*Id.*)

BA and AA allegedly conspired in other ways to prevent USAir from competing in the U.S.-U.K. market. BA allegedly agreed with AA not to seek liberalization of Bermuda II so that USAir would not be able to obtain DoT approval for Phases Two and Three of the Investment Agreement. (*Id.* ¶ 76.) BA allegedly used its influence to delay ongoing negotiations between the United States and the United Kingdom so that any "open skies" agreement would benefit the BA-AA alliance and not the BA-USAir alliance. (*Id.*)

On November 19, 1995, BA informed USAir that BA and AA's proposed alliance included a frequent flyer relationship with terms more favorable than the BA-USAir alliance and a reciprocal code sharing agreement. (*Id.* ¶ 77.) On January 19, 1996, BA announced that it would not exercise its option under Phase Two of the Investment

Agreement. (*Id.* ¶ 78.) However, BA allegedly continued to reassure USAir that any relationship with AA would be "competitive" and that USAir would benefit from such an agreement. BA allegedly misled USAir about the true nature and scope of the proposed alliance with AA until June 11, 1996, when AA publicly announced the BA-AA alliance. (*Id.* ¶¶ 81-85.) The alliance contemplates the pooling of revenues, profit sharing, coordination of flight schedules, integration of passenger and cargo handling between the U.S. and Europe, extensive reciprocal code sharing, and full reciprocity of frequent flyer programs. (*Id.*) The alliance is expressly conditioned on obtaining an order from the DoT conferring antitrust immunity. (*Id.*)

## Discussion

In deciding defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the factual allegations of the complaint must be accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993), and all reasonable inferences must be drawn in favor of plaintiffs, *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). A motion to dismiss should be granted only if it appears beyond a doubt that plaintiffs can prove no set of facts that would entitle them to relief. *Id.*

### I. Antitrust Claims

The Clayton Act provides a private right of action for violation of the federal antitrust laws. Section 4 of the Clayton Act authorizes a "person ... injured in his business or property by reason of anything forbidden in the antitrust laws" to recover treble damages. 15 U.S.C. § 15(a). The Clayton Act's definition of "antitrust laws" includes Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, *see* 15 U.S.C. § 12, the antitrust violations complained of by USAir.

In order to state a cognizable claim of antitrust violation, a plaintiff must allege "antitrust injury." Without antitrust injury, a private party does not have standing to bring an action under the antitrust laws. "[N]ot all competitive conduct that injures another al-

lows resort to laws regulating trade." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 539 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). In order to have standing, an antitrust plaintiff must:

> prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). This requirement of "antitrust injury" applies to claims based on violations of Sections 1 and 2 of the Sherman Act, *see Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990), as well as violations of Section 7 of the Clayton Act, *see Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697; *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 490, 93 L.Ed.2d 427 (1986). The issue, therefore, is whether plaintiff's injury is of the type the antitrust laws are intended to prevent and flows from that which makes the defendants' acts unlawful.

■ USAir does not allege injury to competition in the U.S.-U.K. passenger air service market, separate from injury to itself. Accordingly, the injury alleged by USAir is not of the type the antitrust laws were intended to prevent. The complaint alleges that "BA's and AA's actions have directly and proximately caused harm to competition for air passenger service in various relevant markets between the United States and London," (Am.Compl.¶ 90), by foreclosing and excluding USAir from being an effective competitor in the U.S.-U.K. market. USAir alleges that it was injured by BA's failure to perform or further advance the USAir–BA alliance, and by BA's subsequent decision to seek an alliance with AA. USAir, however, is not presently a competitor in the U.S.-U.K. market and has not served that market during the period relevant to USAir's antitrust claims. Although USAir provided service between Gatwick and Charlotte, Philadelphia,

and Baltimore, prior to 1992, USAir relinquished those routes prior to the BA-USAir alliance. The wrongful actions alleged in the complaint occurred after the routes were relinquished.

■ USAir argues that although it is not presently a competitor in the U.S.-U.K. market, it is a potential competitor that was precluded from entering the market by BA and AA. USAir contends that BA's refusal to engage in a reciprocal code sharing agreement prevented USAir's entrance into the market and thereby injured competition. Although there is some dispute about whether a reciprocal code sharing agreement on routes to Heathrow would be barred by Bermuda II, (*See* BA Memo. at 33; BA Reply Memo. at 13; USAir Memo. at 17–18), USAir's inability to obtain reciprocal code sharing with BA does not satisfy the antitrust injury requirement. Reciprocal code sharing by USAir and BA would not have increased competition in the U.S.-U.K. market. Although USAir would have been able to sell transatlantic seats under its own name, the number of seats and flights available to customers would have remained the same.

USAir argues that with reciprocal code sharing, USAir not only would have been able to offer seats on BA's routes, but would have enjoyed a corresponding increase in sales of flights into the gateway cities from which the flights to the UK originate. There is no question that USAir, which has a strong presence in many of the gateway cities on the eastern seaboard, would have benefited from reciprocal code sharing. However, since reciprocal code sharing would not have created more seats on U.S.-U.K. routes, BA's refusal to engage in reciprocal code sharing did not cause antitrust injury even if it was a violation of the antitrust laws. A competitor or a potential competitor that is injured generally does not have standing under the antitrust laws based solely on injury to itself. *See Capital Imaging Assocs.,* 996 F.2d at 543 ("to prove it has been harmed as an individual competitor will not suffice").

■ USAir's argument that BA and AA caused injury to competition by sabotaging United Airline's bid to purchase USAir, fails

for similar reasons. BA and AA allegedly learned of United's interest in USAir and agreed that it was in their interest to prevent the deal. Accordingly, BA and AA allegedly agreed that AA would make sham bids to dissuade United from acquiring USAir. United's ultimate decision not to acquire USAir did not injure competition. On the contrary, the transaction with United would have eliminated USAir as a separate entity and as a potential competitor. USAir appears to argue that a combined USAir and United Airlines would have been able to compete more effectively against BA and AA in the U.S.-U.K. market, and therefore competition was injured by the sabotaging of the deal. That is not injury to competition, but injury to USAir and United. The antitrust laws are not meant to realign competitors to assist certain competitors over others. *See Cargill*, 479 U.S. at 115–16, 107 S.Ct. at 491–92. "[T]he antitrust laws ... were enacted for the protection of competition not competitors." *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (citation omitted). Courts have stressed that "antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business." *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 685, 136 L.Ed.2d 610 (1997).

■ USAir also argues that it was precluded from competing in the U.S.-U.K. market because BA refused to help USAir attain its own route authority to Gatwick, and because BA deceived it about the true nature of the BA–AA alliance. The two arguments are inconsistent. USAir alleges that BA refused to provide USAir with reciprocal code sharing and refused to support USAir's attempts to apply for its own route authority. Yet, USAir argues that it was induced to forego seeking its own routes or considering other business proposals by BA's misrepresentations about the BA–AA alliance. If, as the complaint alleges, BA refused to assist USAir in seeking its own routes and refused to provide reciprocal code sharing, then BA could not have lulled USAir into believing that it did not need to seek its own route authority.

In any event, USAir's lack of route authority in the U.S.-U.K. market did not flow from that which makes defendants' acts unlawful. In order to satisfy the antitrust injury requirement, the alleged violations of the antitrust laws must be the but-for cause of the injury. *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir.1986) ("lack of causation in fact is fatal to the merits of any antitrust claim"), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). USAir points out that the present regulatory system, although preventing it from obtaining route authority to Heathrow, does not prevent it from obtaining routes to Gatwick. USAir does not allege how BA's lack of assistance prevented it from obtaining route authority to Gatwick. Although BA's refusal to assist USAir's efforts to enter the market may be a breach of contract, it cannot have caused antitrust injury since USAir could have sought and obtained the authority on its own. *See W. Goebel Porzellanfabrik v. Action Industries, Inc.*, 589 F.Supp. 763, 766 (S.D.N.Y.1984) (self-inflicted injury does not provide antitrust standing). Otherwise all the airlines that BA did not assist in obtaining a U.S.-Gatwick route would have standing to assert a private antitrust claim against BA.

■ USAir also makes the general and conclusory allegation that BA and AA have been able to "raise or maintain air fares above competitive levels and limit[ ] consumer choice for air carriers." (Am.Compl. ¶ 90.) General conclusions unsupported by factual allegations do not sufficiently allege the antitrust injury required for standing. *See Volmar Distribs., Inc. v. New York Post Co.*, 825 F.Supp. 1153, 1160 (S.D.N.Y.1993) (dismissing antitrust claim with wholly conclusory allegations about injury to competition). As discussed above, the specific factual allegations concerning antitrust injury fail to allege injury to competition caused by the allegedly wrongful conduct. There is no factual allegation to support the contention that the conduct of BA and AA caused an artificial inflation of prices.

USAir's argument for antitrust injury, in essence, is that as a leading airline in the

northeastern United States, it is a powerful potential competitor in the U.S.–U.K. market. Competition is injured by USAir's inability to enter the U.S.–U.K. market. Potential competitors can have standing under the antitrust laws. *See, e.g., Volvo North America Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988); *Parks v. Watson,* 716 F.2d 646, 659–60 (9th Cir. 1983). However, to satisfy the "antitrust injury" requirement, the injury must be injury to competition, not just to the potential competitor, and the barrier to entrance must be caused by the defendants' unlawful acts. As discussed above, the indirect ways in which USAir allegedly could have competed in the U.S.-U.K. market would not have increased competition in that market.

■ USAir also argues that it need not allege specific antitrust injury because BA and AA's conduct is a per se violation of the antitrust laws. Generally, in determining whether certain acts unreasonably restrain competition in violation of the antitrust laws, a rule-of-reason analysis is applied which requires a showing of antitrust injury. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2556, 53 L.Ed.2d 568 (1977). However, in certain limited circumstances the "challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused.'" *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985) (citation omitted). Invocation of the per se rule is rarely appropriate and should be used sparingly. *See, e.g., State Oil Co. v. Khan,* —— U.S. ——, ——, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) ("we have expressed reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious") (citation omitted); *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 466–67, 112 S.Ct. 2072, 2081–82, 119 L.Ed.2d 265 (1992) ("[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law").

Very few types of conduct merit the application of the per se rule, and USAir fails to allege conduct that would justify its application. In the few cases of concerted refusals to deal with another competitor in which the Supreme Court used per se analysis, competitors attempted to disadvantage another competitor by coercing necessary suppliers or customers to cut off their relationship with the competitor. *See Northwest Wholesale Stationers,* 472 U.S. at 294, 105 S.Ct. at 2619; *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (retailer conspired with manufacturers to cut off supply to competing retailer); *Fashion Originators' Guild of America v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (clothing manufacturers coerced retailers not to purchase clothing from competing clothing manufacturers). BA and AA's alleged wrongful conduct does not fall into this narrow category. Accordingly USAir must allege specific antitrust injury in order to maintain antitrust claims against BA and AA. That, the complaint fails to do.

## II. State Law Claims

### A. Breach of Contract

USAir asserts a breach of contract claim against BA. USAir alleges that BA breached the Investment Agreement by failing to use its "best efforts" to obtain DoT approval for Phases Two and Three and for failing to use "reasonable efforts" to effectuate the transactions contemplated by the Investment Agreement. USAir also alleges that BA breached its implied duty of good faith and fair dealing towards USAir.

The "best efforts" provision of the Investment Agreement, Section 2.6(c), provides in relevant part that BA must "use best efforts to obtain, at the earliest practicable date, DOT Approval of all of the transactions and acts contemplated by [the Investment] Agreement." (Am.Compl.¶ 31.) USAir argues that BA breached this provision of the Investment Agreement when it chose to dis-

courage rather than to seek liberalization of Bermuda II, which under the circumstances was understood by all parties as part of the duty to seek DoT approval.

BA argues that the "best efforts" provision of the Investment Agreement is unenforceable because the Investment Agreement does not provide objective criteria by which to measure performance. USAir argues that the factual circumstances surrounding the Investment Agreement give meaning to the "best efforts" provision, and that under the circumstances the duty to use "best efforts" in seeking DoT approval required BA to seek liberalization of Bermuda II.

▮ Under New York law, a contract need not explicitly define "best efforts" for its "best efforts" provision to be enforceable. *See Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258, 266–67 (S.D.N.Y.1978), *aff'd*, 601 F.2d 609, 613 n. 7, 614 (2d Cir.1979). *See also, e.g., Pfizer Inc. v. PCS Health Sys., Inc.*, 234 A.D.2d 18, 19, 650 N.Y.S.2d 164, 165 (1st Dep't 1996) (affirming injunction enforcing defendant's promise "to 'use its best efforts' to promote plaintiff's products and treat them in a 'favorable manner'"); *Kroboth v. Brent*, 215 A.D.2d 813, 814, 625 N.Y.S.2d 748, 749–750 (3d Dep't 1995) ("[b]est efforts" requires that a party pursue "all reasonable means for obtaining" the promised goal, and whether such an obligation has been fulfilled "will almost invariably ... involve a question of fact").

Moreover, to the extent that the term "best efforts" in the Investment Agreement is ambiguous, and criteria by which to measure the parties' "best efforts" are lacking, the extrinsic circumstances concerning the parties' understanding of that term may be considered by the finder of fact. *McDarren v. Marvel Entertainment Group, Inc.*, 1995 WL 214482, *4–5 (S.D.N.Y. April 11, 1995). Accordingly, the precise meaning of the "best efforts" provision, and whether BA breached the provision, are factual issues that cannot be resolved on the face of the complaint. *Id.*

▮ USAir also alleges that by unilaterally and secretly deciding not to pursue Phases Two and Three of the Investment Agreement, BA breached the "reasonable ef-

forts" provision. Section 10.1(a) of the Investment Agreement, the "reasonable efforts" provision, provides in relevant part that BA is obligated to "use all reasonable efforts to promptly take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or appropriate under applicable laws and regulations ... to consummate and make effective the transactions and acts contemplated by [the Investment] Agreement as soon as practicable." (Am.Compl.¶ 32.) BA argues that it could not have breached this provision because Article V of the Investment Agreement leaves all transactions contemplated by the "Integration Clause" subject to the ultimate discretion of BA's directors. The general "reasonable efforts" provision, BA argues, cannot trump the discretion afforded to BA under the specific provision in Article V.

USAir challenges BA's interpretation of the Integration Agreement and argues that Article V provided BA only with the discretion to determine the nature and scope of further integration with USAir. It did not provide BA with discretion with respect to using "reasonable efforts" to implement the remainder of the Investment Agreement, including securing approval for Phases Two and Three. USAir notes that BA's discretion under Article V is limited in any event by the covenant of good faith and fair dealing implied in every contract. Article V does not, as a matter of law, resolve the question of whether BA breached the "reasonable efforts" provision. Drawing all reasonable inferences in favor of USAir, USAir may be able to prove that BA breached the "reasonable efforts" provision.

▮ USAir also asserts a breach of BA's duty of good faith and fair dealing. New York law implies a duty of good faith and fair dealing in all contracts. *See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 333, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Travellers Int'l. A.G. v. Trans World Airlines*, 41 F.3d 1570, 1575 (2d Cir. 1994). USAir argues that BA breached this implied duty when it secretly decided not to advance the BA–USAir alliance while simul-

taneously pursuing an alliance with AA and when it chose not to seek liberalization of Bermuda II. USAir also argues that BA breached its duty of good faith and fair dealing by misleading USAir about the BA–AA alliance and reassuring USAir that it would not enter into an agreement with AA unless it was acceptable to USAir.

BA argues that it could not have breached the implied duty of good faith because Section 10.7 of the Investment Agreement authorizes other alliances or significant business relationships apart from the BA–USAir alliance. USAir once again disputes BA's interpretation of the Investment Agreement and points out that Section 10.7 does not expressly authorize such transactions, but merely sets out the consequences of an equity investment or business combination—forfeiture of BA's corporate governance rights and its seats on USAir's Board of Directors. Even under BA's interpretation of the contract, USAir may be able to prove that BA breached the implied duty of good faith and fair dealing. In addition to the alliance with AA, BA allegedly made a secret and conscious decision never to complete the transactions contemplated in the Investment Agreement and to otherwise undermine USAir's efforts to pursue the BA–USAir alliance. Accordingly, on the face of the complaint, it cannot be determined that BA did not breach any duty of good faith and fair dealing.

■ Finally, BA argues that the complaint fails to allege any measurable and concrete damages caused by BA's breach. Under New York law, plaintiffs asserting breach of contract claims must allege facts showing damage caused by the alleged breach. *Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435, 436, 529 N.Y.S.2d 777, 779 (1st Dep't 1988); *Calabria v. Associated Hospital Serv.*, 459 F.Supp. 946, 949 (S.D.N.Y.1978), *aff'd*, 610 F.2d 806 (2d Cir. 1979). The complaint alleges that USAir suffered damages of "substantial out-of-pocket expenses incurred by USAir in pursuing and implementing the BA/USAir Alliance, and foregoing opportunities to mitigate British Airways' breach of contract by, among other things, seeking approval for alternative route authority between the U.S. and U.K. and terminating those commercial agreements with BA that are unfavorable to USAir, such as the Code Share and Frequent Traveler Agreements." (Am.Compl.¶ 95.) Although the allegations of damages are short on specifics and USAir may ultimately have difficulty establishing the amount of damages caused by the alleged breach, such allegations are sufficient to survive a motion to dismiss the complaint.

### B. Breach of Fiduciary Duty

■ USAir also alleges that BA, as joint venturer with USAir, breached its fiduciary duty to act with good faith, honesty, fairness, and loyalty. Under New York law, a joint venture "has been variously defined as an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; [and] a combination of property, efforts, skill and judgment in a common undertaking." *Halloran v. Ohlmeyer Communications Co.*, 618 F.Supp. 1214, 1218 (S.D.N.Y.1985). USAir alleges that the alliance between BA and USAir, "as evidenced by the Investment Agreement, the Code Share Agreement, the Wet Lease, the BA/USAir Alliance Contracts, and the actions and statements by BA relating to the BA/USAir Alliance, created a joint venture between USAir and BA." (Am.Compl.¶ 97.) Apparently, the joint venture that USAir alleges involves the whole USAir–BA alliance, not any specific portion of it.

■ In order to form a joint venture, (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit, (2) their agreement must evidence their intent to be associated as joint venturers, (3) each party must make a contribution of property, financial resources, effort, skill or knowledge, (4) there must be a provision for the sharing of profits and losses, and (5) the parties must have some degree of joint control and joint management over the enterprise. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1990); *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F.Supp. 122, 126 (S.D.N.Y.1987). The

absence of any one of the elements is fatal to the establishment of a joint venture. *Id.*

██ BA argues that the complaint fails to allege the elements of intent, sharing of profits and losses, and joint control. USAir argues that some of BA's internal documents describe the BA–USAir alliance as a "joint venture" or "partnership," (Am.Compl.¶ 40), that joint sales and marketing programs, ground-handling operations, maintenance operations, and wet leases involving cost and expense sharing were established, (*id.* ¶ 39), and that Section 5.2 of the Investment Agreement provides for the creation of the Alliance Leadership Group, (*id.* ¶ 39).

These allegations do not sufficiently plead an intent to be joint venturers. A joint venture is a voluntary relationship arising out of contract; it is not a status created by law. *United States v. Standard Oil Co.*, 155 F.Supp. 121, 148 (S.D.N.Y.1957), *aff'd*, 270 F.2d 50 (2d Cir.1959). None of the contracts, including the Investment Agreement, manifests the intent of BA and USAir to be associated as joint venturers. Entry into a series of cooperative agreements does not manifest an intent to enter a joint venture. The creation of the Alliance Leadership Group to oversee the coordination efforts between USAir and BA also does not evidence the necessary intent. It is merely a part of implementing the agreements between USAir and BA. Finally, unless there is evidence of intent in the agreements themselves, the fact that other documents of BA used the words "joint venture" is not enough. The failure to plead intent is fatal to USAir's claim.

USAir also fails to plead the sharing of profits and losses in the alleged joint venture. USAir alleges that the code share agreement entered into on January 21, 1993, provided for the sharing of the costs of developing software and division of the profits according to adopted "prorates," rates at which BA agreed to reimburse USAir for each BA-coded passenger that flew on a USAir flight. (Am. Compl. I 38(b).) In addition, USAir alleges that USAir and BA shared the costs and expenses of a joint sales and marketing effort in the United States, split the salaries and overhead for their joint sales efforts in Canada, split the cost of employee salaries and achieved economies of scale on integrated fuel purchasing, "allocated ... profits and losses on the basis of each party's contribution of service" to a joint maintenance group that serviced third-party airlines, (*id.* ¶ 39.), and shared the costs and profits from the wet leases, (*id.* ¶ 26).

None of the allegations shows a sharing of profits and losses in the "joint venture" that USAir alleges existed. The complaint alleges that both USAir and BA shared the costs of implementing the cooperative agreements that arose out of the BAUSAir alliance. The sharing of profits in the code share agreement, the maintenance service arrangement, and the wet leases does not show a sharing of profits in the "joint venture." The "joint venture" USAir alleges existed is the whole BA–USAir alliance, not a venture in code sharing or a venture in providing maintenance services. There is no allegation that BA and USAir would share in each others' profits and losses in a general way. Nor is there any allegation that there was a breach of any of these specific agreements.

What emerges from the complaint is that BA and USAir entered into several arms-length agreements as part of a general effort to cooperate with each other. No new entity or enterprise was created. The two companies decided to work together and form an alliance, because both initially thought it would be a productive one. Many companies seek to cooperate with each other and reach agreements to implement such cooperation. However, most of these agreements do not create joint ventures. A joint venture represents more than "a simple contractual relationship." *Precision Testing Lab., Ltd. v. Kenyon Corp. of America*, 644 F.Supp. 1327, 1349 (S.D.N.Y.1986).

Accordingly, the complaint fails to allege the essential elements of a joint venture.[1]

1. Because the complaint is defective in alleging the intent and sharing of losses and profits required for a joint venture, I need not reach the sufficiency of the allegations of joint control, another essential element of a joint venture.

## C. Respondeat Superior Liability

Finally, USAir asserts a claim of respondeat superior liability against BA based on the alleged wrongdoing of BA's directors who were on USAir's board. USAir alleges that BA's directors breached the fiduciary duties owed to USAir by "withholding material information from USAir concerning BA's intent to breach and actual breach of its contractual and fiduciary duties to USAir, and affirmatively misleading USAir concerning material facts relating to the nature and the scope of discussions with AA." (Am.Compl. ¶ 102.) USAir argues that BA is liable for the directors' breach of fiduciary duty under a theory of respondeat superior.

Neither side disputes that Delaware law applies because "New York law dictates that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation." *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 n. 3 (2d Cir.1980). It is well-settled under Delaware law that a shareholder does not owe a fiduciary duty to the corporation unless it owns a majority interest in or exercises control over the business affairs of the corporation. *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del.1987). BA was a minority shareholder in USAir, and there is no allegation that BA exercised control over USAir.

USAir argues that BA is liable to USAir for the acts of BA's directors under the general tort principle of respondeat superior. Although it is an interesting claim in theory, USAir has not provided any Delaware authority recognizing such a claim.[2] In practice, the imposition of respondeat superior liability on a corporation for breach of fiduciary duty by its directors on the board of another corporation would completely undermine Delaware corporate law, which limits such fiduciary duty to majority and controlling shareholders. The general tort law theory of respondeat superior cannot be used as means of circumventing clear limitations imposed by Delaware corporate law.

It appears that the only reported Delaware opinion to address this issue is *Emerson Radio Corp. v. International Jensen Inc.*, 1996 WL 483086 (Del.Ch., August 20, 1996), *appeal denied,* 683 A.2d 58 (Del.1996). The *Emerson* court reasoned that "[t]he notion that a stockholder could become a fiduciary by attribution (analogous to the result under the tort law doctrine of respondeat superior) would work an unprecedented, revolutionary change in [Delaware] law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors." *Emerson Radio Corp.*, 1996 WL 483086 at *20 n. 18. Although the facts of the *Emerson* case are not completely analogous, the reasoning applies in this case.

### Conclusion

For the foregoing reasons, all of USAir's claims other than its breach of contract claim against BA are dismissed.

SO ORDERED.

---

**2.** USAir is only able to cite a Pennsylvania bankruptcy court decision. *In re Papercraft Corp.*, 165 B.R. 980, 991 (Bankr.W.D.Pa.1994), *vacated on other grounds,* 187 B.R. 486 (Bankr.W.D.Pa. 1995), *rev'd on other grounds,* 211 B.R. 813 (W.D.Pa.1997).