

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2001

# Martin v. Monumental Life Ins. Co.

Precedential or Non-Precedential:

Docket 00-3307 & 00-3308

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Martin v. Monumental Life Ins. Co." (2001). *2001 Decisions.* Paper 9.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/9

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-3307 and 00-3308

JOHN J. MARTIN, ESQUIRE, TRUSTEE IN BANKRUPTCY

v.

MONUMENTAL LIFE INSURANCE CO.;
MONUMENTAL GENERAL MASS MARKETING, INC.;
MONUMENTAL GENERAL INSURANCE COMPANY;
BANKERS UNITED LIFE ASSURANCE COMPANY;
AEGON USA, INC.; MONUMENTAL GENERAL INSURANCE
GROUP, INC.

John J. Martin, Esquire, Trustee in Bankruptcy,

Appellant in No. 00-3307

Monumental General Insurance Group, Inc.,

Appellant in No. 00-3308

Appeal from the United States District Court
For the Middle District of Pennsylvania
D.C. No.: 95-cv-02198
District Judge: Honorable Thomas I. Vanaskie

Argued: December 4, 2000

Before: McKEE, ROSENN, and CUDAHY,*  Circuit Judges.

(Filed: January 23, 2001)

_____

* Judge Richard Cudahy, Senior Judge, United States Court of Appeals
for the Seventh Circuit, sitting by designation.

Peter J. Mooney, Esq. (argued)
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
 Counsel for Appellant/
Cross-Appellee

James J. Rodgers (argued)
Christie M. Callahan
Dilworth, Paxson, Kalish and
Kauffman, LLP
3200 Mellon Bank Center
1735 Market Street Philadelphia, PA
19103-7595
 Counsel for Appellees/
Cross-Appellant

OPINION OF THE COURT

ROSENN, Circuit Judge.

The primary issue in this appeal concerns a dispute over the interpretation and compliance with two wor ds -- "best efforts" -- in a comprehensive written agreement between two sophisticated business entities, an insurance agency and its underwriter. George N. Pegula Agency ("Agency"), CGA Management Corporation ("Management"), George Pegula ("Pegula"), Barbara Pegula, and Monumental Life Insurance Company ("Monumental") enter ed into an asset and restructuring agreement on December 30, 1993 ("Agreement").1 Agency brought an action in 1995 in a state court against Monumental which was removed to the United States District Court for the Middle District of Pennsylvania alleging a breach of the Agr eement. Agency claimed that Monumental failed to use its "best efforts" to market insurance programs to Catholic Golden Age ("CGA") members. CGA is an organization of senior citizens who are Catholic. After a six-day non-jury trial, the District Court held that Agency did not prove that Monumental failed to

_____

1. When referred to together, George and Barbara Pegula will be referred to as "The Pegulas."

2

satisfy its obligations under the Agreement. The District Court, additionally holding that Pegula wilfully br eached the Agreement, imposed personal liability on the Pegulas under the terms of the Agreement. Agency and the Pegulas were ordered to pay $9,112,760 plus interest of $80,053, costs of suit, and attorneys' fees of $888,048.

Agency timely filed post-trial motions under Fed. R. Civ. Proc. 52 and 59 challenging the District Court's findings, and moved to disqualify the trial judge under 28 U.S.C. S 455(a). After hearing the recusal motion, the District Court denied it. The Court subsequently denied all of Agency's post-trial motions, except that it vacated its finding of personal liability against Geor ge and Barbara Pegula. On April 20, 2000, Agency and Managementfiled petitions under Chapter 7 of the Bankruptcy Code. On November 29, 2000, during the pendency of this appeal, Agency and Management moved this court to substitute John J. Martin, Trustee in Bankruptcy, as party in interest and to amend the caption accordingly.2 We granted the motion.

Agency appealed the District Court's judgment with respect to the interpretation and operation of the "best efforts" provision in the Agreement and challenges the judge's refusal to recuse himself. Monumental General Insurance Group, Inc. timely cross-appealed the District Court's reconsidered ruling that the Pegulas did not wilfully breach the Agreement. We affir m the judgment of the District Court in favor of Monumental and affir m the judgment of the District Court in favor of Geor ge and Barbara Pegula.3

_____

2. This opinion, to the extent it attributes ar guments and contentions to Agency and/or Management, is actually referring to arguments considered to have been raised by the T rustee.

3. Subject matter jurisdiction exists under 28 U.S.C. S 1332. The amount in controversy exceeds $75,000. Plaintif fs/counterclaim-defendants are Pennsylvania corporations with principal places of business in Pennsylvania or are residents of Pennsylvania. See Appx. 5. Defendants/ counterclaim-plaintiffs are corporations incorporated in or with principal places of business located in states other than Pennsylvania. See id. We have appellate jurisdiction because the appellant and cross-appellant have timely appealed from a final judgment of the District Court.

I.

Neither party contests the District Court's findings of fact, so they are the best source of the history of the dispute before us.

A. Breach of Contract

    1. Background

Catholic Golden Age ("CGA") is a non-pr ofit Pennsylvania corporation offering various benefits to its members, senior citizens of the Catholic faith primarily over 60 years old. One of CGA's popular benefits is the opportunity to purchase various types of health and life insurance. Pegula was instrumental in establishing CGA, and is listed on its letterhead as "founder."

As Agency's counsel explained at oral argument, CGA itself had no employees, only a Board of Dir ectors (advised by Pegula) and attorneys representing its interests. CGA is essentially a shell that is run by Management, which is owned by Pegula. By written agreement dated November 4, 1976, CGA appointed Agency as its exclusive agent to market and administer insurance products to CGA members, including billing and collecting pr emiums. CGA also gave Management the exclusive right to of fer non-insurance services to CGA members. Management assumed responsibility for developing membership in CGA and for managing its day-to-day affairs. Between 1976 and 1993, Agency marketed to CGA members health insurance products including Medicare Supplement ("Med Supp"), hospital indemnity, major illness, home health car e, cancer and skilled nursing coverage, and whole life insurance. Agency created all of the promotional material stating that CGA was the sponsor. There was a dir ect relationship between Agency's sales of insurance products to CGA members and Management's success in enrolling new CGA members. Agency's sales to CGA members peaked in 1986, when insurance premiums for new policies totaled almost $3.7 million.

Agency's fortunes decreased dramatically in the early 1990's as sales of new insurance failed to materialize.

4

Between 1990 and 1993, the annual premiums paid to Agency shrank over one third, from $956,581 to $597,257, due in large part to the aging CGA membership. Agency commission income declined accordingly. A 1990 federal law limiting the portion of each Med Supp pr emium dollar available for payment of overhead expenses, marketing, and agent commissions also contributed to Agency's financial difficulties.

Beginning in the early 1980's, Monumental underwr ote the insurance products marketed and administer ed by Agency. During the 1980's, Agency incurred substantial debt to Barclays American Business Credit, Inc. ("Barclays") and to Monumental. In 1988, Monumental, Barclays, Agency, and Pegula restructured theirfinancial relationships. As of October 18, 1988, Agency owed Monumental approximately $3.4 million. Agency defaulted in 1992 and 1993, so in October, 1993, Monumental, Barclays, Agency, Pegula, and Management enter ed a Memorandum of Understanding. Immediately prior to entering this Memorandum of Understanding, Monumental purchased Barclays's note, becoming the sole principal creditor of Agency with a total obligation outstanding of over $8.2 million. On December 30, 1993, the r estructuring Agreement, which is at issue on this appeal, was executed. The Agreement replaced the Memorandum of Understanding.

### 2. 1993 Agreement

Only the provisions of the December, 1993 Agreement relevant to this appeal are stated her e. The Agreement restructured Agency's debt obligations, conditionally relieved George and Barbara Pegula of personal liability for the Agency's outstanding debt obligation, made Agency responsible for marketing CGA membership, and assigned to Monumental the administration and marketing of its insurance products to CGA members. Agency and Management (both controlled by George Pegula) agreed to diligently use their respective best ef forts to market CGA memberships. Agency was required to obtain 20,000 new CGA members by December 31, 1994; 30,000 new CGA members by December 31, 1995; and 40,000 new CGA

5

members for each of years 1996, 1997, and 1998. Failure to generate the required new CGA members constituted an "Event of Default" under the Agreement; Monumental's relief was limited to retention of commissions payable to Agency.

The Agreement required Pegula to cr eate a fund devoted "exclusively for marketing purposes to obtain new members for CGA;" he was required to "use best efforts to initially establish the Fund before March, 1994. Agency was required to provide Monumental with a written marketing plan by December 1 of each year; the plan had to pr oject cost breakdowns, marketing objectives, and a pr o forma detailed accounting of projected membership development expenses and revenues. Pegula's deliberate failure to prepare the required plan was deemed an "Event of Default."

Under S 1.01 of the Agreement, Agency ceded to Monumental the marketing of "[t]he curr ent CGA Life and Health Insurance programs underwritten by [Monumental] or any of its affiliates." Appx. 1473. S 1.01 continues:

> Provided that [Monumental] and/or any of its affiliates is/are licensed in all of the states in which it is determined by [Monumental] and CGA that products are to be marketed . . . to CGA members, [Monumental] shall underwrite and be r esponsible for all new marketing of existing CGA insurance pr ograms and will underwrite and market all new Life and Health Insurance programs, as well as annuity pr ograms to be made available to CGA members. [Monumental] agrees to use its best efforts to actively market insurance and annuities (where agreed upon by CGA and [Monumental]) to the CGA members.
>
> ***
>
> If it is determined by [Monumental] that a particular form of Life, Health, or Annuity product will not be underwritten by [Monumental] or any one of its affiliates after receiving a request fr om CGA to offer such a product, Agency shall then be per mitted to place that particular insurance program, as to that benefit and product structure, with another insurance

6

company. . . . If [Monumental] deter mines that it or any of its affiliates will underwrite and offer a new product, [Monumental] shall use its best ef forts to offer such product to substantially all CGA members located in each state where the product is appr oved by the appropriate governmental authorities. (emphasis added)

The Agreement relieves George and Barbara Pegula from personal liability for the loan balances owing Monumental, provided that the Pegulas did not engage in fraud, wilful or wanton misfeasance, malfeasance or nonfeasance, or deliberate subversion of the intent of the Agr eement.

3. Insurance Economics[4]

The price of any insurance product must first cover the amount the insurance company must pay to its insur eds based on the claims received. For Med Supp insurance, 75% of the premiums for such policies must cover claims or the difference between 75% and the claims cost must be refunded to insureds in subsequent years. If a company's claims cost exceeds 75%, there is no mechanism for an insurance company to recover that additional percentage; the insurer's profit margin is r educed. Insurance companies use a ratio called TAP:MC to price insurance pr oducts and to evaluate whether their marketing activities ar e successful. TAP represents total annualized premium; MC represents marketing costs. Monumental's T AP:MC goal for Med Supp for CGA was 9:1; for other products it ranged from 1.5:1 to 2.5:1. 9:1 was a reasonable TAP:MC goal. The lower the response rate for a particular mailing or marketing campaign, the fewer policies are issued, and each policy must cover a higher percentage of the marketing costs. In creating and implementing a marketing campaign, Agency never used the TAP:MC ratio to determine cost-effectiveness.

To market an insurance product in a state, an insurance company must be licensed to market insurance in that state, the product must be approved by the state, and, in

_____

4. We attribute our information on insurance economics to the analysis of the subject by the District Court. See Appx. 18-21.

7

some states, the approval of the group to which the company sells must also be obtained. In 1993, Monumental was licensed to sell insurance in all states, but it could not market Med Supp in two states. Monumental maintains a "Contracts and Compliance Department" r esponsible for obtaining product approval in all states.

For various reasons, Monumental did not of fer insurance products to individuals over 80 years of age. Accordingly, approximately 25% of the CGA membership consisted of individuals to whom Monumental had no product to market.

>    4. Monumental's & Agency's Marketing Ef forts and
>    Results

In 1994, Monumental developed and tested special creative kits for CGA for some of its pr oducts (not Med Supp), tested telemarketing on Med Supp coverage, and conducted direct mail marketing for all pr oducts other than its Accident, Death & Dismemberment, HIP , and skilled nursing products. Monumental mailed 96,950 marketing pieces to CGA active and inactive members. Monumental spent $96,679 marketing insurance programs to CGA members; it received $275,563 in insurance policy premiums from CGA members. Agency was paid $23,327.95 in commissions from new business generated by Monumental. Agency met its obligation of enr olling at least 20,000 members in 1994.

In 1995, Monumental contracted with an outside entity to create a new insurance solicitation kit. The kit failed, however, and was abandoned. Agency failed to meet its required enrollment goal of 30,000 new CGA members. Monumental mailed 233,849 marketing pieces to CGA members. Monumental spent $178,348 in marketing insurance programs to CGA members; it sold $276,171 in insurance policy premiums and paid Agency $23,576.73 in commission.

In 1996, Monumental tested a gender specific cancer insurance product, marketed a more af fordable Med Supp product to an expanded age bracket, and experimented with a Family Care Product. In that year , Monumental

mailed 117,637 marketing pieces to CGA members, spending $69,316. Monumental earned $152,403 in insurance premiums from CGA members and, determining that Agency breached the Agreement in failing to reach the agreed-upon CGA membership goals, retained all Agency commissions.

5. Other Facts Relevant to Agency's Br each

Between 1993 and 1995, Monumental negotiated advertising rates in the CGA World Magazine. An agreement could never be reached because CGA wanted over $4,000 for advertisements normally costing Monumental $1,800. Monumental never advertised its products in the CGA magazine.

In 1994, Pegula expressed an interest in telemarketing Med Supp, Monumental responded that it would pursue expansion of its current efforts if Pegula proved that his past efforts had been successful. Pegula did not produce the requested information after r epeated requests.

Pegula never created the $200,000 marketing fund required under the Agreement. In 1994, the only year that Agency met its member recruitment requir ement under the Agreement, it spent more to achieve the new members than it received in dues. When Agency proposed its membership plan for 1995, it projected that expenses would again exceed dues revenue. Upon questioning, Agency defended the propriety of membership development not being economically self-sufficient. Because Agency'sfinances were so poor and the 1994 membership marketing plan very costly, Agency did not have the funds to conduct the 1995 membership marketing campaign. Agency also failed to conduct any membership marketing effort in 1996, neither did it meet the minimum of 30,000 new CGA members required of it in 1995, or meet the minimum of 40,000 new CGA members in 1996.

Agency's failure to submit a membership development plan when due, or to submit a marketing plan that could withstand reasonable objection by Monumental, also was held to constitute breach of the Agreement. Monumental rejected the 1995 marketing plan. The District Court found

other breaches of the Agreement by Pegula and Agency not directly relevant to this appeal.

### 6. Monumental's Performance

Between 1993 and 1996, Monumental worked to obtain approval for its products in all states. It expended money for new marketing solicitations for CGA, often employing marketing experts. It marketed insurance products for CGA that it did not offer for other associations. Monumental instituted an expensive computer system that personalized Med Supp insurance solicitations and employed an experienced telemarketer to market Med Supp insurance to CGA members. Monumental changed its affiliates so it could offer cheaper Med Supp insurance. It of fered to use Pegula's suggested telemarketing strategy if Pegula offered evidence that it had been successful, and pr ovided input into Agency's marketing plans, including suggesting that Agency target new memberships in states wher e there was no large CGA membership and where Agency had not previously marketed insurance.

Though Agency does not appeal any of the District Court's findings of fact, it sets forth many examples of Monumental's deficient performance. Agency's contentions cannot be taken seriously because it has not appealed any of the Court's findings of fact. We owe gr eat deference to findings of fact not challenged on appeal. Appellant's brief spends time trying to convince us of the unr easonableness of the District Court's findings without having challenged their accuracy or validity on appeal.

### B. Recusal

Four months before the plaintiffs filed this action, CGA filed a similar action against Monumental concer ning the Agreement. See Catholic Golden Age v. Monumental Life Ins. Co., 95-CV-1359 ("CGA Action" or "CGA"). CGA's complaint involved the same principals, witnesses, insurance products, and trial judge as are involved in the instant case. Attorney George Clark repr esented CGA; Attorney James J. Rodgers ("Rodgers"), of Dilworth, Paxson, Kalish & Kauffman ("Dilworth"), repr esented Monumental. After being assigned the CGA action, the trial judge on August

10

22, 1995 sua sponte informed the parties that he had been affiliated with the Dilworth firm as an associate from 1983 through 1986, and as a partner from 1986 through 1992. The judge had joined Dilworth at the same time as had Attorney Rodgers; in 1986 they both had become partners. The judge worked for the firm in the Scranton office; Rodgers worked in its Philadelphia office. In 1992, the judge terminated his association with Dilworth; his financial arrangements with the firm ceased in October 1994, and he had never represented Monumental during his affiliation with Dilworth. The judge explained that his disqualification "may be appropriate based on an appearance of partiality," but informed the parties that if they desired to waive the ground for disqualification, they could. All parties filed timely written waivers with the Clerk of Court and Judge Vanaskie continued to pr eside over the CGA litigation.

On December 29, 1995, Monumental removed the instant action from the state court to the United States District Court for the Middle District of Pennsylvania. Because of its relationship to the CGA action, this case was assigned to Judge Vanaskie. The first conference between the judge and counsel was held on March 19, 1996 by telephone. Lawrence M. Ludwig ("Ludwig"), counsel for Agency, and James J. Rodgers from Dilworth, counsel for Monumental, participated. It is disputed whether in that confer ence the district judge advised counsel of his potential conflict; Judge Vanaskie and Rodgers claim that disclosure was made and oral waivers obtained. Counsel for Agency claims disclosure was not made. Neither the Case Management Order nor the docket entries reflect any disqualification in the underlying action. Nor do Ludwig's notes of the March 19, 1996 conference call record a disqualification discussion. Counsel for Agency claims that he did not know that Judge Vanaskie conditionally disqualified himself in CGA until after the trial in this case, when Judge Vanaskie held a conference call on January 4, 1999, to schedule a hearing in response to Agency's Rule 59 post-trial motion for disqualification.[5]

_____

5. Before claiming to know about the conditional disqualification in CGA, counsel for Agency based their recusal motion on, inter alia, the district judge's purportedly undisclosed personal relationship with Rodgers. Such a relationship is denied by Rodgers and the district judge. See Appx. at 74.

11

It appears undisputed that Barbara Pegula Verrastro, Pegula's daughter, was corporate designee of CGA during the CGA litigation. Ludwig represented CGA during the settlement negotiations and depositions in the CGA litigation. It is also undisputed that the CGA action arose out of the same 1993 Agreement as the instant action, and that CGA, Agency, and Pegula are inter-r elated entities -- Pegula is the founder of and advisor to CGA and is a principal of the Agency. Judge Vanaskie made full disclosure in the CGA action of his past association with the Dilworth firm and its termination, and Pegula and Ludwig knew of Judge Vanaskie's participation in the CGA action.

Counsel for Agency disclosed at oral argument before this court that CGA is essentially a shell corporation with a Board of Directors and attorneys. CGA is essentially operated by Management. For example, it appears fr om the record that Pegula was a requir ed attendee at the settlement conferences in CGA, even though neither he nor Agency were parties in the action.

II.

There are three issues on appeal: 1) whether the District Court committed reversible error in excluding parol evidence of Agency's understanding of "best ef forts" in the Agreement; 2) whether the District Court violated the recusal statute, 28 U.S.C. S 455; and 3) whether the District Court erred in vacating the portion of its judgment that had imposed personal liability on George and Barbara Pegula for Agency's contractual damages. First, however, we turn to the consequences of Agency's and Management's recent bankruptcy filings.

A. Agency and Management Bankruptcy

On April 20, 2000, Agency and Management filed petitions for relief under Chapter 7 of the Bankruptcy Code. The right to appeal is part of the debtors' estates. See 11 U.S.C. S 541(a). Only Agency's and Management's trustee can pursue their appeals unless the trustee has abandoned the appeals. See 11 U.S.C. S 554(a). On December 1, the trustee, John Martin, Esquire, moved for substitution to

12

pursue the appeal and amendment to the caption of the case. We granted the motion. Therefor e, the appeal is not abandoned and we proceed to the merits.

B. "Best Efforts"

The District Court excluded extrinsic evidence of the parties' understanding of the extent of Monumental's obligation to use its best efforts to market its insurance products to the CGA membership. The court r endered its decision, making findings of fact and conclusions of law without reference to evidence of contemporary facts or discussions concerning the parties' understanding of "best efforts" when the Agreement was enter ed.

The District Court's interpretation of contract law, i.e., the admissibility of parol or extrinsic evidence, or whether the contract is ambiguous, receives plenary r eview. See Sumitomo Machinery Corp. v. Allied Signal, Inc., 81 F.3d 328, 332 (3d Cir. 1996); Commonwealth Dept. of Transp. v. E-Z Parks, 620 A.2d 712, 717 (Pa. Cmwlth. 1993). Where a party makes known the substance of the evidence it desires to introduce, we review the District Court's decision to exclude the evidence for an abuse of discretion. See Narin v. Lower Merion School Dist., 206 F.3d 323, 334 (3d Cir. 2000).

In interpreting a contract, a court must first consider the intent of the parties as expressed in the wor ds used in the agreement. See Mellon Bank, N.A. v. Aetna Business Credit, 619 F.2d 1001, 1009 (3d Cir. 1980). If parties have integrated their agreement into a single written memorial, all prior negotiations and agreements in r egard to the same subject matter, whether oral or written, ar e excluded from consideration. See Nicolella v. Palmer, 432 Pa. 502 (1968). Parol evidence is excluded to preserve the integrity of written agreements by refusing to per mit the contracting parties' attempt to change the meaning of the contract through the use of "extraneous infor mation." See In re: Columbia Gas System, Inc., 50 F.3d 233, 241 (3d Cir. 1995). When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. See Mellon Bank, 619 F.2d at 1010 (citing East Crossroads Center, Inc. v. Mellon-Stuart Co., 416 Pa. 229, 230 (1965)).

13

Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible, however, to establish the meaning of ambiguous terms in the writing, whether or not the writing is integrated. See Mellon Bank, 619 F.2d at 1011; Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1373 (7th Cir . 1990) (inquiry into preliminary discussions precluded unless necessary to "disambiguate" the contract); Proteus Books, Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 509–10 (2d Cir.1989); 11 Richard A. Lord, Williston on Contracts S 33:23 (4th ed. 1999). If the contract terms are ambiguous or incomplete, and extrinsic evidence is examined, interpretation of the contract becomes a question of fact, unless the extrinsic evidence is conclusive. See In re Minnesota Power & Light Company, 435 N.W.2d 550, 563 (Minn. Ct. App. 1989).

A term is ambiguous if it can have two or mor e reasonable meanings. See Sumitomo, 81 F .3d at 332; Mellon Bank, 619 F.2d at 1011. "If a r easonable alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder." Mellon Bank, 619 F .2d at 1011. In determining whether a contract term is ambiguous, we must consider the actual words of the agreement, as well as alternative meanings offered by counsel, and extrinsic evidence offered in support of those alternative meanings. See St. Paul Fire and Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991).

"Best efforts" has been widely held to be an ambiguous contract term. See, e.g., U.S. Airways Group, Inc. v. British Airways PLC, 989 F. Supp. 482, 491 (S.D.N.Y. 1997); Grant v. Board of Educ., 668 N.E.2d 1188 (Ill. App. 1996). In U.S. Airways, the court explained that under New Y ork law, "to the extent that the term `best efforts' . . . is ambiguous, and criteria by which to measure the parties' `best efforts' are lacking, the extrinsic circumstances concer ning the parties' understanding of that term may be consider ed by the finder of fact." U.S. Airways Group, Inc., 989 F. Supp. at 491. "Best efforts" depends on the factual circumstances surrounding an agreement. See T riple–A Baseball Club Assocs v. Northeastern Baseball, Inc., 832 F.2d 214, 225

14

(1st Cir. 1987). However, in Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1373 (7th Cir. 1990), the court reasoned that a "best efforts" clause in a contract with an integration clause could not be illuminated by parol evidence. The Olympia court stated that" `best efforts' is a familiar [term] in contract parlance, and its meaning is especially plain in a case such as this wher e the promisor has similar contracts with other promisees. In such a case `best efforts' means the efforts the promisor has employed in those parallel contracts where the adequacy of his efforts have not been questioned." Id. at 1373.

In this case, the District Court concluded that Monumental exercised its best efforts to market its products to the CGA membership, reasoning that Monumental exercised its business judgment to decide to which CGA members it would market. The District Court defined "best efforts" by refer ence to good faith and sound business judgment. By excluding Agency's offer of extrinsic evidence, the District Court concluded that "best efforts" was not ambiguous and could be construed by r eference to case law and surrounding facts. The District Court held that Monumental exercised its best business judgment in its marketing in the face of Agency's default. Monumental telemarketed and hired consultants even when their results were disappointing, and expended "substantial" amounts on marketing in a "diligent and consistent" ef fort to uphold its end of the bargain. To the extent Monumental got off to a slow start in 1993, the District Court reasoned that Agency's slow provision of CGA membership lists contributed at least in part to the delay.

Agency argues it would have produced extrinsic evidence showing that Monumental promised the following before the written Agreement was executed: 1) Dave Rutkowski of Monumental met with Pegula on or about August 31, 1993 and stated that Monumental's efforts at marketing insurance products to CGA members would r esult in significant new commissions and at least $600,000 in renewal commissions to Agency in the first year; 2) on or about September 22, Micky Feldman, attorney for Monumental, represented that Monumental would advertise in "CGA World" magazine as much as or more than Pegula

15

had done in the past, and that Monumental would spend substantial sums to build insurance sales to CGA members; 3) in conversations between September and December, 1993, Paul Latchford of Monumental assured Pegula that approvals in "no sell" states would be aggressively sought, and that Monumental's marketing efforts would be aggressive in all states; 4) On October 22, 1993, Latchford and Don Loren of Monumental told Pegula that Monumental had a new marketing campaign to aggressively market products in all states; and 5) at an October 18, 1993 meeting, Latchford insisted that Monumental was capable of maintaining the same marketing level Pegula had maintained.

Agency also claims that a Monumental officer said Monumental could do much more business than Agency because it was licensed to sell in all states and had marketing expertise. Agency also claims it was pr epared to offer evidence of Monumental's acknowledgment of an obligation to market to all CGA members, not just members that could meet its profit goals.6  None of Agency's evidentiary offerings suggest that Monumental bound itself to invest in marketing efforts it knew would be unprofitable. Nor do Agency's offerings, taken as true, upset the District Court's conclusions of law.

The Agreement was fully integrated. The Agr eement also contained a provision stating that "[i]n the event of any inconsistency between this Agreement and those prior agreements, this Agreement shall contr ol and any inconsistent terms or provisions in those prior agreements shall be deemed null and void." Section 1.01 of the Agreement is unambiguous, based on a reasonable reading of the Agreement in the context of the surr ounding facts and circumstances.

_____

6. Agency also argues that the Memorandum of Understanding required Monumental to market to all CGA members. But the Agr eement does not retain the term "all, " and S 5.04 of the Agreement states that "[i]n the event of any inconsistency between this Agreement and those prior agreements, this Agreement shall contr ol and any inconsistent terms or provisions in those prior agreements shall be deemed null and void." Agency's reliance on the Memorandum of Understanding is misplaced.

Precedent treats "best efforts" as a form of good faith and sound business judgment. See National Data Payment Systems v. Meridian Bank, 212 F.3d 849, 854 (3d Cir. 2000) (considering "best efforts" in the context of appellee's sale of a business to appellant, and holding that it r equires diligence and an elevated duty of good faith). The District Court's holding in the instant case that Monumental exercised sound business judgment, diligence, and good faith is supported by the record. Agency and Pegula did not define "best efforts" to state clearly Monumental's marketing obligation; in the absence of such a definition, the District Court's interpretation of the ter m is consistent with the surrounding facts and circumstances of the Agreement.

Section 1.01 frequently states "If Monumental determines," implying that there is an element of discretion in Monumental's duty to market to CGA members. "Best efforts" is a dynamic notion. Monumental's best efforts in 1993 were certainly changed when Congress amended the laws concerning Med Supp insurance. No r easonable reading of "best efforts" compels Monumental to market to all, or even to substantially all of the CGA members, regardless of age. Monumental did not compromise its right to exercise sound business judgment in its marketing programs. Its efforts, from working to obtain approval for its products in all fifty states to substantial investment in computers and marketing consultants, but constrained by targeted TAP:MC ratios, evince good faith, fair dealing, and diligence. The District Court properly r ejected extrinsic evidence of the parties' intent.

Even if the District Court had erred as a matter of law by not admitting extrinsic evidence of the parties' intended meaning of "best efforts," the err or would have been harmless. Under Fed. R. Civ. Proc. 61,"[n]o error in . . . the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise distributing a judgment or order , unless refusal to take such action appears to the court inconsistent with substantial justice." The District Court issued a careful and thorough 64-page decision; none of its 231findings of fact were contested on appeal. The District Court'sfindings and

conclusions of law concerning Monumental's "best efforts" are convincing, and we are satisfied that they would not reasonably be affected by the evidence Agency offers. Had the extrinsic evidence been admitted, Monumental would in all probability have responded that it never would have agreed to be forced to market to all CGA members, regardless of the losses in so doing, the absence of their insurability and eligibility, especially when its goal was to recoup funds from Agency and the Pegulas.

Even if Agency's proposed evidence was taken as true and unrebutted, the District Court could have reasonably concluded that Monumental exercised "best efforts" because nothing Agency offered suggests that Monumental was bound to make repeated losing investments in marketing plans. For Agency's theory to prevail, we must believe that Monumental bound itself to make repeated unprofitable marketing expenditures-- from paying inflated advertising rates in the CGA magazine to marketing to CGA members for whom Monumental offered no products or from whom Monumental would obtain little, if any, profit. In light of Monumental's goal to recoup the more than $8 million owing to it by Agency, such a conclusion is illogical. If Agency's contentions were true, it should have appeared in the text of the Agreement; it did not. We see no abuse of discretion by the district judge in excluding Agency's evidence.

C. Recusal

Agency argues that the district judge impermissibly failed to notify counsel of his relationship with Monumental's law firm, and failed to disqualify himself under 28 U.S.C. S 455(e).7 The district judge disqualified himself in the CGA action, but purportedly failed to offer his disqualification in the instant action. Agency claims that the district judge's failure to offer the same disqualification in this action constituted reversible error.

_____

7. 28 U.S.C. S 455(a) states that "[a]ny . . . judge . . . of the United States
shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. S 455(e) provides that "waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification."

18

In reviewing Agency's contention on appeal that the District Court improperly denied its motion for recusal, it is appropriate that we view this motion in its pr oper perspective. Agency alleges no conflict of inter est on the part of the judge; indisputably, there is none. Agency, even after a lengthy an arduous trial, asserts no bias or prejudice of the judge, and, on appeal, challenges none of the judge's 231 findings of fact. Although this pr oceeding followed on the heels of the earlier and related CGA case, Agency made no motion for recusal befor e trial.

Notwithstanding that all of these considerations suggest that plaintiff 's motion is a desperate ef fort to overturn an adverse decision, Agency argues that its motion for recusal deserves favorable consideration because Judge V anaskie sua sponte offered to recuse himself in the prior CGA trial because of his former relationship with the Dilworth firm. The implication of that argument is that the judge must a fortiori recuse himself in this case.

Although the judge offered to recuse himself in the CGA action, he did so out of excess caution. The only applicable section of the recusal statute under the cir cumstances is 28 U.S.C. S 455(a) which, at the same time, sets forth the pertinent standard of review: "Any . . . judge . . . of the United States, shall disqualify himself in any pr oceeding in which his impartiality might reasonably be questioned." See also Liteky v. United States, 510 U.S. 540, 548 (1994); Massachusetts School of Law at Andover v. American Bar Assoc., 107 F.3d 1026, 1042 (3d Cir . 1997). By the time the judge issued his findings of fact and conclusions of law, six years had elapsed since his resignation fr om the Dilworth firm. There were no circumstances showing any lingering, disqualifying relationship and nothing to suggest to any reasonable person an appearance of impartiality. His unnecessary and even improvident disqualification in the CGA was a matter of record, as was the waiver. Furthermore, Judge Vanaskie's history of previous employment and partnership in the Dilworth fir m had been published in his profile contained, since his elevation to the Court, in Volume C of Justices and Judges of the United States Courts.

19

Agency's argument, when distilled, amounts to nothing more than a whisper that the judge's participation in this trial, in light of his prior recusal, has an appearance of impartiality. It certainly had no such appearance to Agency, an intensely interested party, because it claims it knew nothing of the prior recusal until after this trial, although it is hardly possible to accept such a r epresentation in light of the circumstances pertaining to the CGA litigation.

These circumstances reveal that the judge had strong reason to believe that Agency, Pegula, and CGA were so intertwined that his conditional disqualification on the record in CGA was known to the principals in this action. Close study of the record reveals that CGA, Agency, Management, and Pegula had significant cross-over in their business, management, and staffing. Pegula and his daughter are the primary conduit in this cr oss-over. As Agency's counsel admitted at oral argument, CGA has no employees of its own. Although CGA has a Boar d of Directors and attorneys, it executes its Board's commands through Management (i.e., Pegula). Ther efore, the district judge's conditional disqualification in CGA  must be treated as having been known and waived by Agency, which is also controlled and owned by Pegula. Pegula will not be permitted to hide behind corporate for ms to assert lack of knowledge or notice. Agency's argument that neither it nor its counsel knew of the prior CGA disqualification was not convincing to the District Court, nor to us.

We also believe that there must be a mor e compelling standard for recusal under S 455(a) after the conclusion of a trial than before its inception. After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion. See, e.g., United States v. Anderson, 160 F.3d 231, 235 (5th Cir. 1998); Summers v. Singletary, 119 F.3d 917, 920 (11th Cir. 1997).

Support for our ruling can be found in the r ecent case of Microsoft Corp. v. United States, 1221 S. Ct. 25 (2000), where the Chief Justice declined to recuse himself from participating in an appeal in an antitrust action even

20

though his son then represented Micr osoft in separate antitrust actions. See Microsoft Corp. v. United States, 121 S.Ct. 25 (2000). The Chief Justice "[did] not believe that a well-informed individual would conclude that an appearance of impropriety exists simply because[his] son represents, in another case, a party that is also a party to litigation pending in [the Supreme Court]." Id. at 26. In the instant matter, the relationship between the trial judge and the Dilworth firm had terminated several years before the case commenced; there was no blood relationship between the trial judge and anyone in the Dilworth fir m; there is no claim of any bias by the trial judge; and the trial has been concluded. We see no error in the District Court's refusal to grant the motion.

D. Wilful Nonfeasance

Monumental General Insurance Group, Inc. cr oss-appeals the District Court's reconsider ed finding that the Pegulas did not commit wilful nonfeasance in ceasing their performance under the Agreement.

Section 5.03 of the Agreement conditionally r elieved Pegula and Barbara Pegula from personal liability for the restructured loan:

> Pegula shall have no personal liability whatsoever with regard to payment of the loan balances. Excepted from the foregoing is the right to prosecute Pegula in the event of fraud, wilful or wanton misfeasance, malfeasance or nonfeasance or in the event of deliberate subversion by Pegula of the intent of this Agreement which is for Agency and Management to increase CGA memberships, for [Monumental] to market and sell insurance programs to CGA members . . . .

Pegula ceased marketing new CGA memberships in 1995 and never resumed; Monumental asserts that this was wilful nonfeasance. Pegula argues that his nonfeasance was not wilful, and that he was justified in his action because he bona fidely believed that Monumental br eached the Agreement by failing to exercise "good faith."

21

## 1. Procedural Challenge

Monumental first raises a procedural challenge to the District Court's reconsideration of the personal liability issue. Only Agency filed timely post-trial motions under Fed. R. Civ. Proc. 52 and 59; the Pegulas neverfiled such a motion. However, Agency's motion raised the Pegulas' successful request for reconsideration. See Appx. 97 n.1 (District Court's reconsideration memorandum stating "Although the motions were filed only on behalf of Agency, they will be construed as having been filed on behalf of Agency, Management and the Pegulas.") Monumental argues that the effect of construing Agency's Rule 52 and Rule 59 motions as filed by the Pegulas impr operly extended the time for reconsidering the December 8, 1998 Order.

Federal Rules of Civil Procedure 52 and 59 have strict 10 day time limits that cannot be expanded by the District Court. See Fed. R. Civ. Proc. 6(b). A court is constrained to reconsider its rulings within the time limits provided by Rules 52 and 59. See Fed. R. Civ. Pr oc. 6(b). In Hertz Corp. v. Alamo Rent-A-Car, Inc., 16 F.3d 1126, 1128 (11th Cir. 1994), the court held that a co-defendant's filing of timely motion to amend judgment did not excuse another defendant from the ten-day time limit for filing motion to amend judgment.

Agency's post-trial motions clearly raised the Pegulas' arguments for reconsideration. Agency's proposed orders also purportedly included the Pegulas' desir ed outcome. Monumental did not suffer lack of notice. Unlike Hertz, both the motion and supporting memorandum specifically requested relief on behalf of the Pegulas individually, and the District Court treated the motion as having been filed on behalf of the Pegulas as well as Agency and CGA. Under these circumstances, we do not believe it was impermissible for the District Court to consider Pegula's ar guments for reconsideration.

Monumental is incorrect that the District Court extended the time within which the Pegulas could file a post-trial motion for reconsideration. The Pegulas never made a late filing; Agency's timely filing also included the Pegulas. The

22

District Court and Monumental were always on notice that the Pegulas' interests were tied with Agency's, and it was clear to all concerned that the Pegulas' inter ests were advocated in Agency's post-trial submissions. W e see no error in the District Court's treatment of the Agency's motions as also filed on behalf of the Pegulas.

2. Merits

In its December 8, 1998 opinion, the District Court, reasoning that Pegula wilfully refused to perform under the Agreement, attached personal liability to Pegula and his wife under S5.3 of the Agreement.8  On reconsideration, the District Court, relying on a new hearing and a new analysis of the definition of "wilful," held that wilfulness requires an element of fault or culpability -- more than the mere occurrence of an act. Pegula genuinely thought there was legal justification for his failure to comply under the Agreement. The District Court therefor e held on reconsideration that Pegula had not committed a wilful act in violation of S 5.03. In so doing, the District Court also credited Pegula's justification for his actions -- that literally complying with the Agreement would have wr ought financial havoc because it was impossible for his Agency to recoup the projected marketing expenditur es.

This issue turns on whether "wilful" r equires consciousness of fault or culpability, or whether it requires the performance of an act. We exercise plenary review of the District Court's interpretation of the Agr eement. Monumental argues that a decision not to per form a contractual duty, made deliberately, constitutes wilful nonfeasance under the Agreement. Pegula counters with the assertion that wilful nonfeasance requir es a heightened level of ill will beyond a failure to act, and that he never wilfully ceased performance. Pegula also argues that even if he wilfully ceased performance, he was justified in doing it.

Pennsylvania law does not provide a consistent definition of "wilful." Even Black's Law Dictionary pr ovides two definitions:

_____

8. The District Court found that Pegula did not act wantonly in his refusal to perform.

23

> Willful. Proceeding from a conscious motion of the will;
> voluntary; knowingly; deliberate. Intending the r esult
> which actually comes to pass; designed; intentional;
> purposeful; not accidental or involuntary. [Monumental
> wins under this phrasing. But the definition
> continues:]
>
> Premeditated; malicious; done with evil intent, or with
> a bad motive or purpose, or with indiffer ence to the
> natural consequences; unlawful; without legal
> justification. [Pegula wins under this phrasing.]

Black's Law Dictionary 1599 (6th ed. 1990). The District
Court cited Evans v. Philadelphia Trans. Co., 212 A.2d 440
(Pa. 1965) (tort case); Dudley v. USX Corp., 606 A.2d 916
(Pa. Super. 1992) (tort case); and Edmondson v. Zetusky,
674 A.2d 760, 767 (Pa. Cwth. Ct. 1996) (tort case). All of
these cases used the definition of wilful misconduct
entailing mal intent. We must determine, however, whether
Pegula committed wilful nonfeasance under a contract that
also specifies liability for wanton nonfeasance. W ilful
nonfeasance must be distinct from wanton nonfeasance, or
else both terms would not be stated in the same section of
the Agreement. Wanton is defined as r eckless, heedless,
malicious, and unruly. See Black's Law Dictionary 1582
(6th ed. 1990). Interestingly, Black's definition of wanton
includes "willful and malicious." Id. The District Court
relied on In re Jury Estate, 112 A.2d 634 (1955), a case
concerning whether a spouse willfully failed to support his
deceased wife. Jury Estate ruled that "willful" implied
consciousness of fault.

The Agreement before us contemplates thr ee levels of
nonfeasance: plain nonfeasance, willful nonfeasance, and
wanton nonfeasance. Only willful nonfeasance and wanton
nonfeasance trigger the Pegulas' personal liability under
S 5.03. Nonfeasance is the nonperfor mance of some act that
a person is obligated or has responsibility to perform. See
Black's Law Dictionary 1054 (6th ed. 1990). For wilful
nonfeasance to be distinct from nonfeasance, an additional
element of mental state must be present -- an evil intent.
Wanton nonfeasance entails a further heightened mens rea
-- that of reckless, unruly failure to perform an obligation.

24

George Pegula's conduct was nonfeasance; there is no evidence that he had improper motive or evil intent in failing to conduct marketing activities in 1995 and beyond. When Pegula breached his obligations under the Agreement, he had lost a significant amount of money during the prior year, and he had a good faith belief that Monumental had already breached the obligations under the Agreement. Pegula's attorney advised him that he was justified in ceasing performance because of Monumental's perceived breach. Pegula may have been guided by the principle that a breaching party cannot stop performance and continue taking advantage of a contract's benefits. See S&R Corp. v. Jiffy Lube Int'l., Inc., 968 F.2d 371, 375 (3d Cir. 1992). Pegula believed he was excused from performance because, in his view, Monumental had breached the contract, and this released him from continued performance.

The District Court justifiably reconsidered its earlier decision as to Pegula. The Court committed no reversible error by concluding on further consideration that Pegula did not commit willful nonfeasance.

III.

Accordingly, for the reasons stated herein, the judgment in favor of Monumental entered on December 8, 1998 and the order denying the motion for recusal entered on March 9, 1999, will be affirmed. Likewise, the judgment entered on January 25, 2000 granting the Pegulas' request for reconsideration will be affirmed. Each side will bear its own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

25